FRANK E. BEARDSLEY, Respondent, *v.* THE NIEBLO MFG. CO., INC., Appellant.

First Department, December 26, 1930.

*Ambrose L. O'Shea* of counsel [*James W. Donoghue* with him on the brief; *Redding, Greeley, O'Shea & Campbell*, attorneys], for the appellant.

*Donald P. MacArthur* of counsel [*Curtin & Glynn*, attorneys], for the respondent.

MERRELL, J. The action was tried by a justice of the Supreme Court without a jury under a stipulation waiving a jury and dispensing with findings of fact and conclusions of law.

The plaintiff sued to recover damages which he alleges he sustained by the refusal of defendant to renew for one year a written contract after the expiration of the first year's term of plaintiff's employment by defendant. The answer of defendant admitted the making of the contract of employment of plaintiff, the refusal to renew the same and the discharge of plaintiff from the defendant's employment.

The defendant, a New Jersey corporation, was authorized to do business in the State of New York, and had its principal office and place of business in the borough of Manhattan, New York city. It was engaged in the sole business of manufacturing and selling a teeing device used by golfers, to which device the defendant had given the trade name of " The Reddy Tee." On June 16, 1924, at a meeting of the board of directors of the defendant corporation, the services of plaintiff were engaged as general manager of the corporation, at a weekly salary of $100 for the term of one year from March 24, 1924, and at said directors' meeting it was further provided that the plaintiff should have the option of renewing the contract for an additional year after the expiration of the first year at not less than the amount paid for the first year's services, but which renewal option on plaintiff's part was only to be binding on the corporation if the market price of the issued stock of the corporation be at least eight dollars per share on March 24, 1925. Subsequently the contract authorized at said meeting of the board of directors was reduced to writing and was signed by the president of the defendant corporation on June 16, 1924. The evidence shows that under such contract the parties worked from March 24, 1924, until March 24, 1925. On the latter date the defendant notified plaintiff in writing that the plaintiff's services as general manager would no longer be required by the defendant, stating as its reasons that the plaintiff's services had been inefficient,

incompetent and neglectful, and also, as a further reason, that the existing contract between defendant company and the plaintiff had terminated. Plaintiff was requested to turn over to the president of the company all books, papers, vouchers, agreements and other things in his personal custody or possession. On the day following, March 25, 1925, plaintiff replied in writing, refusing to turn over to the defendant the books of the company and insisting on a renewal of his contract.

The evidence very clearly disclosed that soon after entering upon the performance of his duties as general manager of the defendant company the relations between the plaintiff, who was himself a stockholder of the defendant corporation, and its president and the remaining stockholders of the corporation became strained, resulting in an entire lack of harmony between the officers of the corporation and the plaintiff. At that time the stock of the corporation was owned in substantially equal amounts by the president of the corporation, William Lowell, by Walter L. Niebling, a son-in-law of Lowell, and by plaintiff. On December 8, 1924, by reason of the existing discord in the corporation, Niebling sold to William Lowell, defendant's president, the stock in the corporation which he held, receiving in payment therefor the sum of $5,000. From that time on until plaintiff's discharge the strained relations between plaintiff and the holders of the remaining stock of the corporation became more acute, so that at the end of plaintiff's term of employment it became quite evident that there must be a discontinuance of all relations between the corporation and the plaintiff, its general manager. The evidence discloses an entire lack of confidence on the part of the president and other shareholders of the corporation in the plaintiff and that the services which he was rendering for the corporation were entirely unsatisfactory. By the terms of the contract plaintiff was to give his services to the defendant as general manager of the corporation. The evidence shows that the plaintiff, during the term of such contract, engaged in other business and in advertising and disposing of a large quantity of clock works and of patented display tables which had been manufactured by a corporation with which plaintiff had been theretofore identified, but which had gone into bankruptcy. This merchandise had been purchased by plaintiff at receiver's sale, and the evidence disclosed that during the term of his employment he conducted, under his former corporate name, the business of disposing of said merchandise which had been brought to the place of business of the defendant corporation, using defendant's employees and organization in such business; that when repeatedly remonstrated with, the plaintiff as often

promised to end such business activity, but did not do so. Plaintiff, at the trial and upon the appeal, denied having engaged in such outside business activity, and sought to minimize its importance. It, however, appeared that, upon complaint of a competitor, plaintiff was placed under arrest for engaging in such business under an unregistered name, and was subsequently convicted of a violation of the statute with reference to registering with the county clerk the name under which he was pursuing his business pursuant to the provision of section 440 of the Penal Law. The proceeding in Magistrate's Court was instituted against plaintiff prior to the expiration of his term of employment as general manager for defendant and was brought to the knowledge of defendant prior to the expiration of his term. His conviction in Magistrate's Court was, upon appeal, affirmed by this court. (*People* v. *Beardsley*, 219 App. Div. 779.) The evidence further disclosed that plaintiff, on several occasions during the latter part of his original term, made disparaging remarks of and concerning the president of the defendant and his son, stating to other employees of defendant that the Lowells were crooks, and that the business would not last through the year; that if the Lowells obtained control of the company the employees would not receive money for their services, but would get candies and flowers instead and that he himself contemplated withdrawing from the business and starting a new business, and that he would drive the defendant corporation out of business. Plaintiff himself, upon the witness stand, admitted that he may have stated that the Lowells were crooks, and that if they gained control of the company it would go broke in a year's time. The evidence also shows that plaintiff, soon after becoming business manager of the defendant, changed the combination of the safe in defendant's place of business in which were kept the defendant's books of account; that he instructed his secretary not to permit the president of defendant or any one else to see said books of account, but to keep them concealed, and that if defendant's president called for the books, to show him some old books and that defendant's president would not know the difference. The evidence also shows, without denial, that plaintiff did actually conceal the corporation's books when the defendant's president appeared at their place of business, and that at the time of the expiration of his term the plaintiff refused to return its books to the corporation and subsequently removed the same to the State of New Jersey. The evidence also disclosed that during the term of the plaintiff's employment reports came to the president of defendant and the other officers of the corporation that plaintiff had been guilty of making improper advances toward

young women in the defendant's employ; that such improper and lascivious advances were, in fact, made by plaintiff was testified to by a considerable number of young women and young men in the employ of defendant, and it was charged against plaintiff that he was responsible for the delicate condition of a young lady who acted as his secretary and who was about to become a mother. Plaintiff himself, upon the witness stand, categorically denied the testimony of each of four young women with reference to improper conduct and advances of plaintiff. These alleged improper acts charged against plaintiff were shown to have come to the knowledge of the defendant's president and other directors of the defendant corporation prior to the refusal of defendant to renew plaintiff's contract, and, if true, were certainly sufficient grounds for the defendant's refusal to continue the plaintiff longer in its employ. Apparently the learned justice presiding at the trial, and who directed the verdict in plaintiff's favor, disbelieved the testimony of the young women with reference to plaintiff's improper and unbusinesslike conduct and believed plaintiff's denial of such charges. In discrediting the testimony of the appellant's witnesses in substantiation of the charges of immoral conduct on the part of plaintiff, we think the decision of the trial justice was clearly against the overwhelming weight of the evidence.

As a condition precedent to plaintiff's right to a renewal of his contract with the defendant, the burden was upon plaintiff to show that on March 24, 1925, the market price of the defendant's stock was eight dollars per share. This the plaintiff failed to show by competent proof. The most that the plaintiff was able to show to establish the market price of the defendant's stock were two offers, one admittedly made by a friend of plaintiff's and at the plaintiff's suggestion, offering the defendant's president ten dollars a share for ten shares of the capital stock of the corporation. It appears from the evidence that this offer was made without any knowledge on the part of the person offering to purchase the stock as to the assets of the corporation or other facts or circumstances showing any knowledge of the actual value of the stock which he offered to purchase. The plaintiff himself also claims to have offered, without stating any price, to purchase the entire stock of the corporation at the time of his discharge. These offers clearly were insufficient to show any market price of the stock in question. No sales of the stock were proven, except that on December 8, 1924, the defendant's president purchased 833 shares, the stock of his son-in-law, for $5,000, amounting to about $6 per share. Plaintiff also introduced in evidence three reports which he had had prepared as treasurer of the corporation, the

first of which was as to the condition of the corporation in October, 1924, and the last in January, 1925. Admittedly, these treasurer's reports were incomplete and furnished no basis whatever for fixation of market price of the defendant's stock as of the date of March 24, 1925. The term " market price " has a well-defined meaning. Words and Phrases Judicially Defined (Vol. 5, p. 4387) defines the term " market price " as follows: " Market value is the price established by public sales or sales in the way of ordinary business, as of merchandise." The Court of Appeals in *Sloan* v. *Baird* (162 N. Y. 327, 330) defined " market value " as follows: " The market value of property is established when other property of the same kind has been the subject of purchase or sale to so great an extent and in so many instances that the value becomes fixed." In *Levant American Commercial Co., Inc., v. Wells & Co., Inc.* (186 App. Div. 497), the Appellate Division held that in order to establish a market price of an article, actual sales must be proven. In Sedgwick on Damages ([9th ed.] § 245) the text writer states that unaccepted offers are meaningless and that to make a market there must be buying and selling and that " the asking price can not be said to be the market value. On the other hand unaccepted offers can not be taken as the market value." The only sale of the stock of the defendant proven at the trial was the sale to defendant's president hereinbefore mentioned, at which the price paid amounted to six dollars per share. Plaintiff utterly failed to show that the market price of the defendant's stock on March 24, 1925, was eight dollars per share. This fact alone was sufficient ground for the denial of plaintiff's option for a renewal of his contract.

Moreover, the defendant was entirely justified in dispensing with plaintiff's services at the end of his term on March 24, 1925. His attitude toward his superior officers in the corporation was of such a nature as to preclude his continuance in the defendant's employ, and the defendant was fully justified in discharging him by reason of his frequently expressed attitude toward his superior officers. (*Jerome* v. *Queens City Cycle Co.*, 163 N. Y. 351, 356; *Speiden* v. *Innis, Speiden & Co., Inc.*, 216 App. Div. 408.) It is very evident from the testimony in this case that plaintiff's usefulness as general manager of the corporation had come to an end prior to his discharge. Not only was he charging his superior officers as being crooks and incompetent businessmen, and openly predicting that the business would not last a year, and that he himself would start a new business, and that the employees would receive no pay other than flowers and candy if the Lowells obtained control of the corporation, but his conduct in refusing to permit the president

of the corporation and others interested to examine or have access to the books of the corporation, his changing of the combination of the defendant's safe in which such books were kept, his secreting the books, and, finally, the removal thereof from the place of business of the defendant corporation to the State of New Jersey, clearly forfeited any reasonable claim on his part to be continued as the defendant's business manager. Not only this, but the defendant's officers, shortly before his discharge, were informed of impending criminal prosecution against him which finally resulted in plaintiff's imprisonment at Welfare Island under a jail sentence, and also of his probable punishment for contempt of an injunction granted by the Federal court restraining him from further engaging in a separate business, all coming to the knowledge of the directors of the defendant, fully justified them in declining to further continue plaintiff in the defendant's employ. Plaintiff's obstinate refusal to discontinue his separate business activities in the defendant's place of business, and which resulted in the criminal charge brought against him, justified his discharge as matter of law.

While the contract itself does not, in terms, state that the plaintiff is to bestow his entire time in the defendant's business, we think it was clearly inferable from the language used that the plaintiff's entire time should have been so devoted. In Wood on Master and Servant ([2d ed.] § 111, p. 215) that text writer says: " Where a person is employed by another for a definite period, in a certain business, the employer is entitled to his entire services in that business during the term, and if the servant engages in the same or any other business on his own account, or for others, during the term, he is chargeable with a breach of his contract, and may be discharged therefor." (See, also, *Stoney* v. *Farmers' Transportation Co.*, 17 Hun, 579; *Seaburn* v. *Zachmann*, 99 App. Div. 218.)

Entirely aside from plaintiff's failure to prove the market price of the issued capital stock of the defendant corporation as of March 24, 1925, at eight dollars per share, which was a condition precedent to any right on the part of the plaintiff to a renewal of said contract, the conduct of plaintiff throughout his service with the defendant was such, not only to justify, but to compel, a discontinuance of his services at the end of his contract.

The judgment and order appealed from should be reversed, with costs, and plaintiff's complaint dismissed, with costs.

DOWLING, P. J., MARTIN and SHERMAN, JJ., concur.

Judgment and order reversed, with costs, and complaint dismissed, with costs.