In the Matter of the Accounting of CENTRAL TRUST COMPANY OF ROCHESTER, as Executor and Trustee under the Will of GOTHLIEB KITTELBERGER, Deceased, Respondent. GLADYS JUDD et al., Appellants; FRANK D. BERTCH et al., Respondents.

Fourth Department, June 19, 1957.

*David M. Levy* and *Bernard M. Pogal* for Gladys Judd and others, appellants.

*Edwin A. Williams* fór Laura Martin and others, appellants.

*Howard M. Woods* and *Philip M. Liebschutz* for Central Trust Company, as executor and trustee, respondent.

*George J. Skivington* and *George R. Williams* for Frank D. Bertch, respondent.

*Arthur VD. Chamberlain,* special guardian, respondent.

BASTOW, J. This appeal is from a decree construing certain portions of decedent's will and making allowances to all counsel appearing in the proceeeding. To place the contentions of the respective parties in proper focus it is necessary to refer briefly to the will and certain prior proceedings.

The testator by paragraph Sixth of his will granted to one Bertch an option to purchase all of the stock owned by decedent in Webaco Oil Company, Inc. (hereinafter referred to as " Webaco ") upon certain terms and conditions. It was provided that the right to purchase should be " at a fair and reasonable price to be fixed by my Executor * * * and my Attorney, Philip M. Liebschutz." The validity of this option and its subsequent exercise by Bertch has been previously passed upon by the Surrogate. It was then decreed that the option was enforcible; that Bertch had duly exercised the option; that he was not responsible for the subsequent delay and that the executor was legally obligated to negotiate with Bertch for the sale of the stock. That decree was affirmed by this court (2 A D 2d 805). In our memorandum we recognized the fact that the record then before us showed that the executor and Bertch had negotiated and a contract had been entered into between them for the sale and purchase of a portion of the stock owned by testator. We rejected, however, Bertch's contention that the portion of the decree requiring the parties to negotiate should be amended upon the ground, among others, that a proceeding seeking approval of the contract was then pending before the Surrogate and the legality thereof was not before us.

A few days after our decision was handed down the executor moved before the Surrogate to be relieved from performing its obligations under the contract and to have it declared null and void. The application was based upon the affidavit of an officer of the corporate executor. It was alleged that Bertch was the president and director of Webaco; that in fixing the price of the stock the executor and Liebschutz had relied upon certain facts relating to the financial status of Webaco and the value of its assets and earnings; that since making the contract it had been established that the information relied upon was not complete and did not clearly reflect the financial condition and

earnings of Webaco; that the executor and Liebschutz did not have such additional information at the time of making the agreement and if the true facts had been known the agreement would not have been made; that Bertch failed to reveal important facts concerning the finances of Webaco, which were known to him and by reason of such withholding the agreement should be invalidated.

Thereafter hearings were held before the Surrogate. No testimony was taken and the somewhat vague charges were not amplified. It may be concluded that no appearing party opposed the making of a decree invalidating the contract but much time was consumed in determining the form of the decree. The attorneys for the remaindermen while not opposing the nullifying of the contract wanted to examine Bertch and others. The dispute centered upon the wording of a recital in the decree as to fraud or wrongdoing on the part of Bertch. All doubts were resolved by the consent in open court of respective counsel for all parties to the entry of a decree invalidating the contract and containing no recital upon the subject. This was done and no appeal was taken from that decree.

Thereafter, the Surrogate made the decree in part appealed from at this time. As has been stated, the option granted to Bertch directed that the right to purchase the shares of stock should be '' at a fair and reasonable price to be fixed by my Executor * * * and my Attorney, Phillip M. Liebschutz.'' It was further stated in the will that in fixing the price of the stock attention was directed to a prior sale by testator in his lifetime to Bertch of 1,000 shares of Webaco at $50 per share.

The Surrogate decreed that under this paragraph of the will the decedent intended that the executor and attorney '' place a value on the stock which value is to be less than the market value of the stock and one which is fair and reasonable to all parties.'' The executor, the attorney, Liebschutz and Bertch seek to uphold this construction. The remaindermen and the special guardian claim it is erroneous.

We start with the fact that all of the 4,190 shares of Webaco are closely owned. They are held by the executor, other members of the Kittelberger family and Bertch. At the time of his death testator owned 2,970 shares and in his lifetime as stated in the will had agreed to sell 1,000 shares (not included in the 2,970 shares) to Bertch at $50 per share. The fixers of the price named in the will contend that the phrase '' fair and reasonable price '' as used by testator may mean fair market value, more or less than fair market value, a price of $50 per share or a price less than $50 per share. It is unnecessary to pass upon

these several contentions. It seems to us that upon the facts here presented the attempt to link the market value of the stock with its fair and reasonable price is confusing if not meaningless.

The phrase " market value " in its legal sense has two meanings. The first is the price established by public sales or sales in the way of ordinary business. (*Beardsley* v. *Nieblo Mfg. Co.,* 231 App. Div. 152, 157.) Or otherwise stated, " market value of property is established when other property of the same kind has been the subject of purchase or sale to so great an extent and in so many instances that the value becomes fixed." (*Sloan* v. *Baird,* 162 N. Y. 327, 330.) This principle has been codified in section 122 of the Decedent Estate Law where it is provided that stocks customarily bought or sold in open markets shall be valued by ascertaining for the day on which the appraisal is required " the range of the market and the average of prices as thus found, running through a reasonable period of time." If the Surrogate used the phrase " market value " in this sense it is illusory because it is inferrable that in this close corporation there have been no public sales between a willing seller and a willing buyer. Therefore, it is without meaning to say that the price of the shares shall be fixed at a price less than a figure that is undeterminable.

The phrase is frequently used in a secondary or figurative sense, meaning actual value, the fair or reasonable value of property, that is, such a value as the property would have if it were dealt with in accordance with the practices of a market overt. (55 C. J. S., Market, p. 789.) The phrase could not have been used in this sense in the decree because so used it is practically synonymous with fair and reasonable. The testator did not intend that the price should be less than " fair and reasonable " because those were the words used by him.

We see no reason to attempt to construe the plain language of the decedent. He directed his executor with the assistance of his attorney to fix a fair and reasonable price and gave Bertch the option to purchase at the fixed price all and not part of the Webaco stock owned by testator. There are guide posts to direct the price fixers both within and outside of the will. As to the former their attention was directed to testator's lifetime sale of 1,000 shares of Webaco at $50 per share. This is one of the evidentiary facts to be considered. It must be evaluated in the light of the then financial position of the company, its position in the market and many other factors. It is plain that testator could have provided that the stock be sold to Bertch at $50 per share, or more or less. He did not do so.

He saw fit to vest in his fiduciary and his attorney the quasi-judicial function to examine and consider all pertinent and material facts, including the statements in the will, and then fix the fair and reasonable price of the shares of stock.

Moreover, outside of the will there are guides for the fixers of the price. Thus, in the area of estate taxation of stock, such as Webaco, the value of shares in a closely owned corporation for which there has been no bona fide sales in the open market is generally based on book value. Many courts, however, have recognized that such a method is unfair and have held that where there are no sales, stock of a close corporation is to be valued by resorting to all the tests and measures of value ordinarily adopted for business purposes in estimating the value of property; that is, the business of the corporation, its property, value of actual assets, present and contingent liabilities, dividends, growth of the business and its financial results. (Inheritance & Transfer Taxes [Prentice-Hall], Vol. 1, § 724.)

It should be made clear that we are not attempting to construe the pertinent portion of the will. In our opinion it does not need clarification and the Surrogate in the exercise of a proper discretion should have declined to entertain the application to construe this paragraph of the will.

In the prayer for relief in the petition for judicial settlement of its first account the executor asked for a construction of paragraphs Seventh A and Seventh B of the will. There were no facts set forth upon which such request was based and no reason was given for requesting the construction. Paragraph Seventh gives the residuary estate to the trustee and directs it to divide such residue into two equal and separate trusts. Paragraph Seventh A directs that the net income from one of the trusts be paid to testator's daughter, Laura Martin, and her children in equal shares " during the lifetime of my said daughter." Upon the death of the daughter " this trust is to terminate and the principal and undistributed income I give, devise and bequeath and direct my　＊　＊　＊　Trustee　＊　＊　＊ to pay same in equal shares to the children of my daughter, Laura Martin, the share of any deceased child to be paid to the issue of said child, if any, otherwise to the surviving children of my said daughter." Paragraph Seventh B is identical except that the life beneficiaries are testator's daughter, Gladys Judd, and her children. The gift of the remainder is in the same language.

The daughters, Mrs. Martin and Mrs. Judd, are living. Mrs. Judd is a widow and has two living sons, both over 21. Mrs. Martin is living and has four living children, all over 21.

Neither daughter has any deceased child. There are at least five great-grandchildren of testator, who are children of the sons and daughters, respectively, of the children of Mrs. Martin and Mrs. Judd.

The Surrogate was asked to construe these paragraphs and decide whether the gifts of the remainder to the children of Mrs. Martin and Mrs. Judd, respectively, were vested or contingent. The Surrogate decreed that the remainders were contingent and not vested. It was freely conceded on the part of the Judd and Martin families that the sole purpose of the construction proceeding was to oust the special guardian, who has appeared in these various proceedings through the years to represent the infant great-grandchildren. It is the contention of the appealing life beneficiaries that the remainder vested in the respective children of the two daughters upon the death of the testator. Therefore, the great-grandchildren have no possible interest in these proceedings and a special guardian was improperly appointed. Neither the present record nor the one on the prior appeal discloses when the special guardian was first appointed. It does not appear that any appeal was taken from the order appointing him.

As heretofore stated, the question as to whether these remainders are vested or contingent is at present strictly academic and will continue to be so until one of two events occurs, that is, if either Mrs. Martin or Mrs. Judd should have another child or if one of the present living children should predecease his or her mother. Absent one of these contingencies upon the death of either Mrs. Martin or Mrs. Judd the remainder would vest in the living children with the same result as they presently seek to establish.

In our opinion the Surrogate erred in entertaining the application to construe these paragraphs of the will. It is a familiar rule in this area of the law that "Where the question raised as to the meaning of the will is not presently vital, it is considered academic and will not be heard." (3 Jessup-Redfield on Surrogates' Law and Practice, § 2895.) "A matter is academic where the determination of the issue is not necessary. Stated another way, where the construction is not presently pertinent, it will be deferred until necessity arises for its determination. * * * Thus, there is no need to determine the devolution of remainders while the remaindermen are living. * * * Akin to the refusal to hear academic questions is the matter of premature applications for constructions. It is held that the court will not pass upon legal consequences of an event which may never

happen. * * * Construction has been held premature where a possible contingency is remote, or where in addition the question is also speculative." (*Ibid*, §§ 1845–1846.)

If doubt remained it is dissolved by the laches of the life beneficiaries. The will of decedent was probated more than four years ago. At whatever stage a special guardian was appointed the present appellants could have sought and obtained a quick determination as to whether such action was properly taken. From all that here appears there was no objection to such appointment. After lengthy proceedings and a prior appeal to this court in all of which the guardian has actively participated we are not persuaded that a will construction proceeding should be used at this late date as a vehicle to bring about the ouster of the guardian. The requested construction of these paragraphs should have been denied upon the ground that the meaning of the will is presently academic. Upon this record it follows that the appointment of the special guardian may not be questioned.

The last portion of the decree appealed from is that making allowances to all appearing attorneys in the sum of $12,500 each for a total amount of $75,000. After the Surrogate had handed down a decision construing certain paragraphs of the will a hearing was held before the Surrogate with all counsel present. The court announced that it was ready to pass upon allowances but no party had applied for an allowance or did so at the hearing, except that the executor in its petition for settlement of its first account had asked that the compensation of its attorney be fixed. After some preliminary discussion stated amounts were awarded. In answer to an inquiry from one counsel the court affirmed that the allowances were " for services to date." The decree provides, however, that the allowances were " for services rendered in this construction proceeding." We are unable to determine whether these allowances were made solely for services rendered in the construction proceeding or for all services to the date of the award.

Section 231-a of the Surrogate's Court Act gives the Surrogate power at any time during the administration of an estate to fix and determine the compensation of an attorney for services rendered to an estate or its representative or to a devisee, legatee or person interested. That proceeding, however, must be instituted upon the petition of a representative of the estate, or a person interested or an attorney who has rendered services. There must be adequate proof of the services performed and the value therof. (*Matter of Richardson*, 250 App.

Div. 199, 201.) Section 278 of the Surrogate's Court Act gives the Surrogate discretionary power to make allowances where a decree is made in a proceeding to construe a will

In any event, in the light of the objections made at the hearing there should have been proof submitted by affidavits or testimony showing the nature and amount of the services performed, the reasonable value thereof, the size of the estate and other pertinent facts. There is nothing in this record by way of oral or written evidence as to services performed to permit this court to review the amount of the allowances except that the total allowances amount to nearly 10% of the gross estate as shown by the Federal tax return. The allowances should be eliminated from the decree.

In our opinion either before another proceeding is brought for the making of allowances or in connection therewith there should be a full exploration of the facts that prompted the executor to ask for the nullification of the contract between it and Bertch for the sale and purchase of the shares of Webaco stock. The facts are sparingly stated but sufficient is set forth to conclude that the prior price fixed by the executor, according to its allegations, was the result of the withholding by Bertch from the executor and Liebschutz of "important facts concerning the assets, liabilities and earnings" of Webaco, which were known to Bertch and if revealed by him the executor states that the contract would not have been made. Upon one of the hearings counsel for Bertch paraphrased these allegations and then said that "If that is not an allegation of fraud I don't know what is."

We obviously make no attempt to pass upon what is not before us but before making allowances it would seem to be a minimal requirement that this matter be fully explored so that the actions of Bertch may be known as well as the degree of care used by those charged with the responsibility of fixing the contract price of the stock. All of this might have relevancy upon the matter of allowances to the respective attorneys for these parties.

Lastly, we note that now that the contract has been nullified this stock purchase option reverts to the place it was more than four years ago when Bertch exercised the option. We recognize that there were extenuating circumstances during the period from June 1, 1953 to April 1, 1954. The executor, however, to assist it in fixing a price obtained an appraisal report in December, 1954 from a recognized appraisal company. It is now contended that this report is of little help in fixing a price for the stock. We are concurrently herewith affirming an order of the

Surrogate authorizing Mr. Liebschutz to retain another management concern at a cost not to exceed $5,000 to furnish its opinion as to the value of the stock. During the years there have been various proceedings, some pertinent and some extraneous, for examinations before trial, construction of various paragraphs of the will and applications to eliminate a party and incidentally the special guardian. We believe that the time has come when all concerned should proceed with reasonable dispatch to bring about the implementation of the provisions of paragraph Sixth A of the will or a determination to the contrary.

The decree insofar as appealed from should be reversed and the matter remitted to the Surrogate's Court to proceed in accordance with this opinion.

All concur. Present—McCURN, P. J., VAUGHAN, KIMBALL, BASTOW and GOLDMAN, JJ.

Decree insofar as appealed from reversed on the law and facts and matter remitted to the Surrogate's Court to enter a decree in accordance with the opinion, with costs to all parties filing briefs payable out of the estate.