JACK RUDMAN, Respondent-Appellant, and FRANCES RUDMAN et al., Appellants, v. COWLES COMMUNICATIONS, INC., et al., Appellants-Respondents.

First Department, November 12, 1970.

*John F. Cannon* of counsel (*James E. Blackwood* with him on the brief; *Sullivan & Cromwell*, attorneys), for appellants-respondents.

*Martin Kleinbard* of counsel (*Mark H. Alcott* and *Theodore W. Striggles* with him on the brief; *Paul, Weiss, Goldberg, Rifkind, Wharton & Garrison*, attorneys), for respondent-appellant and appellants.

EAGER, J. P. The plaintiffs and defendants appeal from a judgment entered upon the decision of a Special Referee, the defendants appealing from that part of the judgment awarding a recovery to plaintiff Rudman on the third cause of action, and the plaintiffs cross-appealing from that part of the judgment dismissing the first and second causes of action, awarding a recovery to defendants upon their eleventh counterclaim and limiting plaintiffs' recovery on the third cause of action to a sum less than that demanded.

The plaintiff (Rudman) was employed by defendant Cowles Communications, Inc. (the Company) "to perform such executive and administrative services in the educational publishing operations of Company or its wholly owned subsidiaries as shall from time to time be reasonably assigned to him by the Company's Board of Directors and subject to the instructions, direction and control of senior executives of the Company". The employment was by written agreement, dated June 30, 1966, and the term of employment as therein stated was from

July 1, 1966 to June 30, 1971. Rudman, by paragraph 2 of the employment agreement, expressly agreed to "faithfully, conscientiously and diligently serve the Company * * * to the best of his ability"; to "devote substantially his entire time and attention, except during reasonable vacation periods" to the affairs of the company; and to "do nothing in any way inconsistent with his duties to, or adverse to the interests of, the Company."

It is true as pointed out by the dissent that the contract for the employment of Rudman was part of a transaction involving a sale to the Company of the publishing business of plaintiffs. Although the other writing and extrinsic circumstances may be considered in the matter of a construction of the employment contract, full effect must be given to the plain and unambiguous terms thereof and to the relationship thereby established.

Contrary to his explicit contractual obligations, Rudman, on assuming the duties of his employment, adopted and persisted in a course of conduct conflicting with the duly authorized suggestions and reasonable directions of his senior executive, Maurer. In spite of the fact that he well understood that it was the direction of Maurer and in the interests of the Company, that he co-operate with his fellow employee Whitney in the affairs of the educational publishing division of the Company, Rudman adopted a hostile attitude toward Whitney and Whitney's assistant, ultimately refusing to work with them. It became his duty to prepare and furnish within a reasonable time sections of the manuscript for a college board entrance exam book, and initially he undertook this responsibility. Subsequently though, and without justification, he refused and failed to prepare and deliver sections thereof.

As expressed in an October 4, 1966 letter addressed to Maurer, he arbitrarily took the position that the plan of basic organization of the education division of the Company was "irrevocably unacceptable" to him. His letter was uncompromising and disputatious in tone and there is no proper support for the finding, implicit in the trial court's decision, that there was thereafter a failure on the part of the Company to "at least try to iron out, if possible, any difficulties or misunderstandings that might have existed on either side." Subsequent to October 4, Maurer and Rudman did indeed have a conversation and discussed the matters in controversy and subsequently Rudman was given every opportunity to comply with the terms of the employment agreement. However, he continued in his refusal to work with Whitney in the corporate interests,

including in the matter of manuscripts and materials for the college board entrance exam book and on certain other books and tests being published by the Company.

It is settled law that an employer generally is entitled to direct how an employee shall perform his duties, and in so doing the employer is entitled to consult his own convenience as well as the interest of his business. So long as such directions are not unreasonable (and there can be no claim of unreasonableness here), the employee is bound to obey them, and it is no answer to a charge of disobedience for an employee to say that some other method of doing the business was better than that which the employer chose. (See *Macauley* v. *Press Pub. Co.*, 170 App. Div. 640, 643–644, affd. without opn. 222 N. Y. 696.)

Here, Rudman in effect assumed the dictatorial attitude that the education division of the Company would be required to be operated under his terms or he would not co-operate in the work of the division. We find no justification whatever for his attitude and his conduct immediately prior to and after October 4, 1966; his conduct constituted insubordination to those executives in positions of authority over him in the Company's affairs.

When the continuous refusal to comply with lawful and reasonable directions of an employer reaches such proportions as to be deleterious to the employer's interests, is inconsistent with continuance of the basic employer-employee relationship, and effectively stalls the conduct of important and duly authorized business affairs, then the disobedience is a breach of duty, and like other breaches, entitles the employer to rescind the employment contract. The opinionated insistence upon doing things in his own way, rather than as the employer reasonably directs, is not the employee's prerogative. (See Wood, Master and Servant [2d ed.], p. 226.) "The defendant, in making the contract, did not abdicate its position as master nor waive control of its business" (*Jerome* v. *Queen City Cycle Co.*, 163 N. Y. 351, 357. See, also, *Speiden* v. *Innis, Speiden & Co.*, 216 App. Div. 408; *Beardsley* v. *Nieblo Mfg. Co.*, 231 App. Div. 152, 157). Certainly, a corporation is entitled to protect itself from the consequences of a division within its ranks.

Accordingly, Maurer acted within his authority, and we find that he acted in good faith in the interests of the Company when, on January 12, 1967, he terminated the employment agreement with Rudman. The dismissal was fully in accordance with the terms of the agreement which provided that "the Company may, at its option, terminate this Agreement on

ten (10) days' notice, in the event Rudman violates the provisions of Paragraph 2 hereof [hereinbefore referred to] or in the event Rudman otherwise commits a material breach of this Agreement by failing to perform the obligations undertaken by him hereunder. In such event, the Company shall be obligated to pay Rudman the compensation due him up to the date of termination only.'' Under the circumstances, there is no valid support for plaintiffs' third cause of action maintained to recover damages for breach of the employment agreement.

Furthermore, we conclude that the Referee improperly awarded a recovery to defendants upon their eleventh counterclaim. The Referee awarded a recovery on this counterclaim in the sum of $1,347.42 on the ground that clause II(1) of the agreement of sale amounted to '' a warranty that the total tax liabilities of Old College Publishing [Rudman's former company] and its subsidiaries would not exceed $9,013.81, and that the warranty extended to the statements that were to be delivered [after the closing]. Since the taxes thereafter paid amount to $10,361.23, which is $1,347.42 over the amount warranted '', he directed a recovery of such sum against the plaintiffs Rudman as sellers.

The sellers (Rudman and his wife) had delivered to the purchasing company a consolidated balance sheet through April 30, 1966 and the agreement provided that '' no later than 30 days after Closing Date, a consolidated balance sheet of the Companies as of the Closing Date, together with a related consolidated statement of profit and loss and surplus for the period from May 1, 1966 to the Closing Date '' shall be delivered to the Company. Then it was agreed that the consolidated statement, to be so delivered, '' shall contain no material adverse changes from the aforesaid consolidated balance sheet as of April 30, 1966 and the aforesaid related statement of profit and loss and surplus for the period from November 1, 1965 to April 30, 1966.'' Under the circumstances, and in accordance with the agreement of the parties, this was merely a representation by the sellers that the June 30 statement would not contain any '' material adverse changes '' from the consolidated balance sheet before the parties at the time of contracting.

In essence, the sellers agreed that they had not misrepresented the financial condition of their company and that they would do nothing to prejudice the buyers between the sale and closing. Considering the balance sheets as a whole, it is clear that the $1,347.42 increase in actual tax payments over the estimated figure did not represent a '' material adverse '' change in the

current liabilities of the sellers' company, nor was it established that the comparatively small change in current liabilities arose between the time of the sale and the closing. In summary, the plaintiffs' agreement did not amount to a warranty of conformance of the statement to be delivered following the closing (i.e., the June 30, 1966 statement) with the April 30, 1966 statement, and we conclude that the evidence does not establish the right of the Company to recover on the eleventh counterclaim.

Findings by the Referee inconsistent herewith are reversed and annulled and new findings made as indicated herein. The judgment herein should be modified, on the law and the facts, to dismiss plaintiffs' third cause of action and to dismiss the defendants' eleventh counterclaim, and judgment should be otherwise affirmed, without costs and disbursements on the appeal; and the trial court having properly dismissed plaintiffs' first and second causes of action, the plaintiffs' complaint should be dismissed without costs.

McGivern, J. (dissenting). I fear the majority misconstrue the nature and purpose of the contract. We have here no ordinary master-servant relationship. An application of the general rules applicable to that relationship lends no substantial support to a solution of the problem presented by this appeal. Here, we have an executive employment contract, on a high echelon, of a former owner of a successful enterprise sold by him to the defendant, simultaneously with the contract of employment. The sale and the employment contract are one. A "package deal". So regarded by the briefs and by the concessions on oral argument. They were integral and indivisible. There would have been no bargain, no acquisition, save for the promises of enduring employment. "So read in the context of their execution, these two documents are not separate, distinct and unrelated as the petitioner would have it, but rather they are two transactionally integrated pieces of a single larger agreement having as its purpose the securing of appellant's employment by the petitioner." (*Matter of ITT Avis* v. *Tuttle*, 27 N Y 2d 571, 576, dissenting opinion of Burke, J.) It follows, if the employment contract is breached, the plaintiff is entitled to damages, as prayed for in his complaint.

And the trial court has found a breach of the employment agreement.

In my view, we should not reject out of hand this result achieved by the trial court. "Evaluations and determinations

reached *de novo* at the appellate level, amounting, in effect, to complete redeterminations of basic issues, are usually best avoided. (Cf. *Power* v. *Falk,* 15 A D 2d 216, 218, *supra; Kundla* v. *Symans,* 9 A D 2d 1021.) '' (*Conklin* v. *State of New York,* 22 A D 2d 481, 483.)

Yet the majority have not only reversed the trier of the facts, they have dismissed the plaintiff's complaint.

To the contrary, I believe the Trial Judge properly found a breach of the employment contract. (See 6 Williston, Contracts [3d ed.], § 863, p. 275; *Converse* v. *Schmidlapp,* 264 App. Div. 381, affd. 290 N. Y. 834.) And this finding warrants damages (*Lauer* v. *Raymond,* 190 App. Div. 319, 327).

The testimony of the defendants' witnesses not only leaves unchallenged but confirms the claim of the plaintiff Rudman that he was induced to enter into the dual agreements by the promises of the representatives of Cowles that he was to be the "*number one man* * * *" in over-all charge of the editorial aspects of the test book division '' to be created by Cowles upon consummation of the acquisition agreement. The endeavor of the defendants to insulate the acquisition agreement against a finding of a breach of the employment agreement is not persuasive. At the very least, the record establishes plaintiffs were induced to enter into the transaction by material misrepresentations which even if not fraudulent, were actionable. (See *Dennerlein* v. *Martin,* 247 N. Y. 145; *Converse* v. *Schmidlapp, supra,* and *Lauer* v. *Raymond, supra.*)

Prior to the execution of the formal agreements, Cowles' representatives told plaintiff Rudman that he would be '' the editor in charge '' of the test book operation and the '' number one man '' in the test book division. Furthermore, although the employment agreement required the employment of plaintiff Rudman for only a period of five years, with an option to defendant Cowles to renew for a further period of five years, the plaintiff Rudman was told and was led to believe that his employment would be a '' permanent marriage '' until his normal retirement age.

Although the great expectations of Rudman may be viewed askance, we cannot disregard his reasonable and justifiable expectation as to the *nature of the position* which he was to enjoy under the employment agreement, at least for the period of time specifically designated therein, together with its concomitant prestige and status.

True, his duties were spaciously described as '' executive and administrative services * * * assigned to him by the Company's [Cowles'] Board of Directors ''. Yet, nothing in

this generalized description gives any intimation that his duties were to be other than the duties of "the number one" man in charge of the editorial division of the test book division. The ambiguous description of the services fully warranted receipt of the objectionless testimonial admissions of the defendants relating to these duties. I perceive no obscurities in the nature of the promises made to plaintiff Jack Rudman, what he was led to believe, and the defendants' breach of these promises.

The evidence reveals that, notwithstanding the promise that he would be the number one editor in charge, he was directed to relinquish his editorial privileges, or alternatively subject his views to the editorial judgment of a relatively young and inexperienced woman, earning less than half of his salary, who possessed no comparable status in the organization. The destruction of his editorial privileges may not be justified on the theory that Mrs. Klagsbrun was an alter ego of the senior executives, whose supervision he agreed upon. This theory ignores the realities of the situation, even assuming that this young woman was acting under the authorization of her immediate superior, one David Whitney, whose status was that of a vice-president of the test book division, College Publishing Corporation, just as plaintiff Rudman was. In this connection, it must be noted that Whitney's salary was about the same as Rudman's, but unlike Rudman, Whitney did not have an employment agreement or any previous experience in the test book field.

Furthermore, unlike Rudman, Whitney's compensation was not directly tied to the performance of the test book division, College Publishing Corporation. At best, Whitney was an executive of parallel stature with Rudman. He was not a senior executive of Cowles, and defendants made no effort to show that Whitney was such within the meaning of the agreement. Whether Whitney was or was not a director of College Publishing Corporation is of little significance. Even if Whitney enjoyed the alleged status as the head of the Cowles education division, which he seemingly did not, he was not empowered to alter plaintiff's agreed-upon status. And the evidence is that Gilbert Maurer was the head of this division. In any event, the education division was merely an ephemeral, unincorporated grouping, without officers or directors, quite different from the corporate structure, to which the agreement definition refers.

In short, under the agreement, Maurer also had no right to subject Rudman to the supervision of Whitney, much less both. When he did so, he, not Rudman, was "disrupting the organization" and denying the plaintiff the *promised privileges*

*of his office,* which was to be that of the number one editor in charge of the test book division. Not unjustifiably, Rudman was led to believe as chief editorial man he would be in the top management of the testing subsidiary and the link to the top management of the parent organization. Even if it was contemplated that plaintiff was to be under the supervision of a senior executive, such duty did not include an obligation to relinquish the status of being the principal and number one editor in charge of the test book division. To argue otherwise would be to make valid an otherwise illusory consideration, the sustainment of which would permit the perpetration of a fraud — a denial of the *quid pro quo* which led to the execution of the acquisition and employment agreements.

I find it difficult to understand how plaintiff's insistence on being accorded the promised privileges of office can be converted into a valid claim of "insubordination" justifying his discharge. Plaintiff's duty to co-operate with fellow employees did not include an obligation to extinguish his right to be "in overall charge of the test book division"; and such delay as may have ensued in the delivery of sections of the manuscript, referred to in the majority opinion, as also plaintiff's objection to a restructuring of the organization so as to derogate from the prerogatives rightfully his, and demeaning his promised status, must be considered as but the sequel to the disturbed relationship, initiated by defendants' prior breach of their obligation to plaintiff.

It may well be that the differences between plaintiff and defendants arose from a personality disharmony which ultimately led to the defendants' belief that he would be unassimilable in their organization. If this be true, it does not follow that the defendants are entitled to strip the plaintiffs of their property rights, acquired under the acquisition agreement, and retain them with impunity. Neither does it follow, because they guessed wrong as to the digestibility or assimilability of the plaintiff Jack Rudman that they may deprive him of his rights under the employment agreement.

In my view, the record and the concessions made by the defendants compel the conclusion that the defendants breached the employment agreement, and consequentially must respond appropriately for their unlawful retention of the fruits of the acquisition agreement.

Lastly, this case is essentially one in equity and requires equitable considerations. These equitable considerations, under all the circumstances, lead me to believe that a proper disposition requires (1) a modification of the judgment of the third

cause of action so as to sustain the finding of liability by the defendants for a breach of the employment agreement, but a present deletion of the damages found, (2) a finding that, as an alternative to the rescission prayed for in the first cause of action, the plaintiffs are entitled to monetary damages, such as they may be, as prayed for in the second cause of action, and (3) that this case be remitted for *further proof* with respect to the damages properly allowable for breach of both the acquisition and employment agreement.

This disposition is believed to be the proper one because plaintiffs have obviously received the major portion of the *quid pro quo* bargained for under the acquistion agreement, and the equities do not lend themselves to relief in the form of rescission as requested in the first cause of action. There is a *paucity of evidence in respect of damages sustained* and the extent of a proper allowance required to be made in *mitigation* because of the breach of the employment agreement, as also the extent of the unjust enrichment of defendants, arising from the consequential breach of the acquisition agreement.

So far as the eleventh counterclaim of the defendants is concerned, I am in agreement with the view of the majority opinion that it should be dismissed for the reasons stated therein.

CAPOZZOLI, MARKEWICH and McNALLY, JJ., concur with EAGER, J. P.; McGIVERN, J., dissents in part in opinion.

Judgment, Supreme Court, New York County, entered on August 18, 1969, so far as appealed from, modified, on the law and the facts, to dismiss plaintiffs' third cause of action and to dismiss the defendants' eleventh counterclaim, and the judgment is otherwise affirmed, without costs and without disbursements; and the trial court having dismissed plaintiffs' first and second causes of action, plaintiffs' complaint is dismissed, without costs.